IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

JESSICA S. STANDEN,                )
                                   )        CASE NO. 1:15CV482
                    Plaintiff,     )
        v.                         )
                                   )        JUDGE JAMES GWIN
                                   )
                                   )        MAGISTRATE JUDGE
COMMISSIONER OF SOCIAL             )        KENNETH S. McHARGH
SECURITY ADMINISTRATION,           )
                                   )        REPORT & RECOMMENDATION
                    Defendant.     )

This case is before the Magistrate Judge pursuant to Local Rule 72.2(b).  The issue before the undersigned is whether the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Jessica Standen's ("Plaintiff" or "Standen") applications for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq*., and for a Period of Disability and Disability Insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, is supported by substantial evidence and, therefore, conclusive.

For the reasons set forth below, the Magistrate Judge recommends that the decision of the Commissioner be AFFIRMED.

## I.  PROCEDURAL HISTORY

Plaintiff filed applications for Disability Insurance benefits and Supplemental Security Income benefits on September 1, 2011, alleging disability due to arthritis, anxiety, insomnia, depression, and fibromyalgia, with an onset date of June 1, 2009.  (Tr. 209-210, 218-19). The

Social Security Administration denied Plaintiff's applications on initial review and upon reconsideration. (Tr. 92, 101, 112, 126, 138).

Plaintiff requested that an administrative law judge ("ALJ") convene a hearing to evaluate his applications. (Tr. 178-79). On October 2, 2013, an administrative hearing was held before Administrative Law Judge Thomas M. Randazzo ("ALJ"). (Tr. 36-91). Plaintiff, represented by counsel, appeared and testified before the ALJ. (*Id*). A vocational expert ("VE"), Thomas F. Nimberger, also appeared and testified. (*Id.*). On October 31, 2013, the ALJ issued a decision finding Plaintiff was not disabled. (Tr. 13-27). After applying the five-step sequential analysis,[1] the ALJ determined Plaintiff retained the ability to perform work existing in significant numbers in the national economy. (*Id.*). Subsequently, Plaintiff requested review of the ALJ's

---

[1] The Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability." *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The Sixth Circuit has summarized the five steps as follows:

    (1)    If a claimant is doing substantial gainful activity–i.e., working for profit–she is not disabled.

    (2)    If a claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled.

    (3)    If a claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

    (4)    If a claimant's impairment does not prevent her from doing her past relevant work, she is not disabled.

    (5)    Even if a claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that accommodates her residual functional capacity and vocational factors (age, education, skills, etc.), she is not disabled.

*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

decision from the Appeals Council.  (Tr. 9).  The Appeals Council denied his request for review, making the ALJ's October 31, 2013, determination the final decision of the Commissioner. (Tr. 1-5).  Plaintiff now seeks judicial review of the ALJ's final decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c).

## II.  EVIDENCE

### A.  Personal Background Information

Plaintiff was born on August 18, 1982, and was 26 years old on the alleged onset date. (Tr. 92, 209).  Plaintiff reported earning an Associate's Degree in Business Administration through an online university.  (Tr. 45, 314).  Plaintiff has past work as an administrative assistant, barista, personal assistant, medi-spa manager, at-home trophy assembler, and positions in retail and auto sales.  (Tr. 58-65, 239).  Plaintiff is married and lives at her parents' house with her two children, ages six and ten.  (Tr. 46).

### B.  Medical Evidence[2]

The medical evidence on the record relates to both Plaintiff's physical and mental impairments. However, Plaintiff's challenges to the ALJ's findings relate primarily to her physical impairments.  Accordingly, this summary focuses on medical evidence relating to Plaintiff's physical condition during the relevant period.

#### 1.  Heather Godale, M.D.

On January 10, 2009, Plaintiff presented at the Lodi Community Hospital emergency room with complaints of pain in her left shoulder and left middle back, and was treated by Heather Godale, M.D.  (Tr. 446-47).  Treatment notes reported Plaintiff told Dr. Godale that she had a similar episode 3-4 weeks prior, where she again presented to the emergency room, after

---

[2] The following recital of Plaintiff's medical record is an overview of the medical evidence pertinent to Plaintiff's appeal.  It is not intended to reflect all of the medical evidence of record.

which Marie Kuchynski, M.D. (Plaintiff's rheumatologist), ordered more blood work to test for autoimmune diseases that might be causing her arthritis and pain.  (Tr. 446).  Plaintiff reported a history of psoriatic arthritis and fibromyalgia, and notes also indicated anxiety.  Rating her discomfort at 8 out of 10, Plaintiff complained of worsening neck and back pain but no numbness, tingling, or weakness.  (*Id.*).  Dr. Godale noted Plaintiff had no neurological deficit or midline CTLS spinous process tenderness without step off or joint swelling, but did have significant trapezious, rhomboid and left parathoracic muscular tenderness with spasm.  (*Id.*).  She further noted Plaitniff exhibited symmetric reflexes and normal range of motion of her shoulders.  (*Id.*).  Dr. Godale gave Plaintiff one dose of Dilaudid and Phenergan intramuscularly, as well as one dose of Valium, and placed her on a short course of Percocet and Valium in addition to ibuprofen, instructing her to follow up with her rheumatologist.  (Tr. 446-47).

2.  <u>Marie Kuchynski, M.D.</u>

Following nine months of treatment at the Wooster R.A. clinic, Plaintiff presented for a rheumatology consultation with Dr. Kuchynski on January 8, 2009.  (Tr. 464).  Plaintiff reported she was diagnosed with arthritis and fibromyalgia at age 13, and was previously in remission but symptoms increased in 2005.  (*Id.*).  Her symptoms worsened during her 2007 pregnancy, and she exhibited no progress during her treatment at Wooster.  (*Id.*).  Dr. Kuchynski noted swelling of the metacarpophalangeal (MCP) joints, wrists, knees, and ankles, and gave an impression of rheumatoid arthritis not responding to methotrexate, livedo reticularis, and a need to rule out other disease process.  (Tr. 465).  Treatment notes also indicated a history of panic attacks.  (Tr. 464).

Plaintiff followed-up with Dr. Kuchynski on January 22, 2009, and was prescribed Arava and Vicodin, discontinued on methotrexate and leucovorin, and continued on Flexeril and

tramadol. (Tr. 445). Plaintiff reported she continued to have significant pain and had trouble dealing with even easy activities. (*Id.*). Dr. Kuchynski reported Plaintiff exhibited no acute distress, but appeared to be in pain. (*Id.*). Test results were negative for rheumatoid factor and anti-CCP antibody, ANA was negative, and anticardiolipin antibodies were normal. (*Id.*).

Dr. Kuchynski again treated Plaintiff on March 12, 2009, at which time Plaintiff reported increasing problems with her fibromyalgia due to diffuse pain and ineffectiveness of medications, as well as being under tremendous stress caused by foreclosure on her house. (Tr. 291). On examination, Dr. Kuchynski reported Plaintiff was in no acute distress, did not have any synovitis of her MCPs, PIPs, or DIPS, and while her wrists had some swelling, her elbows and shoulders were normal. (*Id.*). Additionally, Plaintiff exhibited diffuse tender points consistent with fibromyalgia. (*Id.*). Dr. Kuchynski continued Plaintiff on immunosuppressive therapy upon assessment of fibromyalgia and rheumatoid arthritis, and increased her Vicodin dosage, noting Plaintiff had only been taking two per day, and had stopped taking tramadol because she believed it ineffective. (*Id.*).

On April 7, 2010, Plaintiff returned to Dr. Kuchynski and reported that her medications were working and she suffered no gastrointestinal side effects, but she was still in a lot of pain, had some swelling in her feet and hands, and that flexeril did not relieve her muscle cramping. (Tr. 426). Examination revealed no synovitis, warmth, tenderness, or swelling of any of the following joints: CMC, IP, PIP, DIP, wrists, elbows, shoulders, hips, knees, ankles, or spine (SI joint, Schober, SLR, paraspinal). (*Id.*). However, Dr. Kuchynski found swelling of her MCP and over dorsum of her feet with splaying of toes. (*Id.*). Dr. Kuchynski noted Plaintiff had rheumatoid arthritis and was on high risk immunosuppression, and, although she agreed to continue on her current medication, Plaintiff did not wish to continue pain management. (*Id.*).

Dr. Kuchynski further documented that, although her disease was clinically not too active, Plaintiff continued to complain of excessive pain.  (*Id.*).

At follow-up appointments dated July 10, 2010, October 18, 2010, and February 24, 2011, Plaintiff reported no worsening stiffness, swelling, or pain (except for increased pain due to weather in October), and that her medications were working to control her symptoms.  (Tr. 414, 421, 424).  Notes indicated Plaintiff was tolerating her medication well, with no complaints of fatigue, diarrhea, fevers, or weight gain.  (*Id.*).  The only reported joint abnormalities during this time period was mild swelling of the MCP in October of 2010, which did not appear in the February 2011 report, although Plaintiff exhibited some pain on ROM at that time.  (*Id.*).

On May 16, 2011, Plaintiff again presented to Dr. Kuchynski complaining of increased pain and ineffective medications.  (Tr. 408).  Plaintiff reported that the previous week she had experienced severe leg swelling that "went away as quickly as it started," and examination showed pain on range of motion of shoulder, although no synovitis, warmth, tenderness, or swelling of any of the following joints:  CMC, IP, PIP, DIP, wrists, elbows, hips, knees, ankles, or spine (SI joint, Schober, SLR, paraspinal).  (*Id.*).  An X-ray of her shoulder showed normal and unremarkable results.  (Tr. 409).  Plaintiff again reported tolerating her medications well, with no changes in weight, no fever, no diarrhea, and no fatigue.  (Tr. 408).

At her next appointment on October 20, 2011, Plaintiff informed Dr. Kuchynski that, since her last appointment, she had lost her insurance, causing her to discontinue most of her medications and had suffered severe symptoms of withdrawal from Lyrica. (Tr. 407).  However, at that time Plaintiff was back on her medications, but wanted to try fentanyl patches and refrain from Lyrica.  (*Id.*).  Plaintiff tolerated the medication well, and reported no changes in weight, no fever, no diahrrea, and no fatigue.  (*Id.*).  Examination again revealed no synovitis, warmth,

tenderness, or swelling of any of the following joints:  CMC, IP, PIP, DIP, wrists, elbows, shoulders, hips, knees, ankles, or spine (SI joint, Schober, SLR, paraspinal).  (*Id.*).

On January 27, 2012, Plaintiff reported no worsening pain, stiffness, or swelling, and that, although medications were controlling her symptoms, she experienced some breakthrough pain with fentanyl.  (Tr. 406).  However, Plaintiff maintained she could not afford Lyrica to help with numbness.  (*Id.*).  Muskuloskeletal examination revealed no joint abnormalities, and Plaintiff again reported she was tolerating her medications well, with no weight changes, fevers, diarrhea, or fatigue.  (*Id.*).  By her appointment on May 21, 2012, office notes reported the same findings, with no indication of breakthrough pain, and, although Plaintiff complained of ankle and foot pain, she also indicated she was getting more exercise.  (Tr. 401).

Plaintiff cancelled her next two scheduled appointments, but was seen by Dr. Kuchynski on October 24, 2012.  (Tr. 398-400).  Plaintiff reported increased swelling of her joints, and examination showed swelling in her ankles and feet.  (Tr. 398).  Notes indicated continued tolerance of medication, with no weight changes, fever, diarrhea, or fatigue.  (*Id.*).  However, at her follow-up on March 11, 2013, Plaintiff reported no worsening pain, stiffness, or swelling, but was experiencing bouts of diarrhea for several months, with no abdominal pain.  (Tr. 396).  Notes reported Plaintiff continued to tolerate her medications, which were controlling her symptoms, and Plaintiff reported no weight change, fever, or fatigue.  (*Id.*).  Examination again revealed no joint abnormalities.  (*Id.*).

Dr. Kuchynski completed two RFC questionnaires, one on October 24, 2011, and the other on May 3, 2013. (Tr. 302-04, 527-28).  In the first questionnaire, Dr. Kuchynski stated she diagnosed Plaintiff with rheumatoid arthritis (fair prognosis), with frequent symptoms of pain, stiffness, and fatigue severe enough to interfere with work-related attention and concentration.

(Tr. 302).  The questionnaire stated Dr. Kuchynski treated Plaintiff for this condition every three months since January 8, 2009, and that her medications caused her drowsiness and nausea that could impair her capacity to work.  (*Id.*).  Dr. Kuchynski opined Plaintiff could walk less than a block without significant pain, could sit/stand fifteen minutes, required a position where she could shift positions at will, and would be limited to siting/standing only two hours total in an eight hour work day.  (*Id.*).  Plaintiff would need three unscheduled breaks up to thirty minutes in duration during the work day, and could occasionally lift and carry less than 10 pounds, but never 10 pounds or more.  (Tr. 303).  According to the report, Plaintiff also had limitations in her ability to do repetitive reaching, handling, or fingering; specifically, the questionnaire stated that Plaintiff could use her hands to grasp, turn, or twist objects, her fingers for fine manipulation, and her arms for reaching, only 10% of the time during an eight hour work day.  Further, she stated Plaintiff would likely be absent from work three to four times per month due to her impairments or treatments.  (*Id.*).

The May 3, 2013 questionnaire included some of the same, as well as some modified, limitations.  Dr. Kuchynski at that time again included a diagnosis of rheumatoid arthritis (fair prognosis) with joint pain (sedation as a medication side effect) as the only frequent symptom of such severity as would interfere with her abilities to perform work-related tasks.  (Tr. 527).  Dr. Kuchynski again opined Plaintiff could only walk one block without rest or pain, but now could only sit for twenty minutes and could stand/walk for ten minutes, and required a job where she could shift positions at will.  (*Id.*).  Further, Plaintiff would need unscheduled breaks for fifteen to thirty minutes, two to three times per workday.  (*Id.*).  The remainder of opinion information mirrored the October 27, 2011 questionnaire.  (Tr. 527-28).

    3.   <u>Susan Arceneaux, M.D. (Lodi Community Hospital rehabilitation Services Department)</u>

On referral by Dr. Kuchynski for pain management therapy, Plaintiff received treatment from July 31, 2009 through October 2, 2009 at Lodi Community Hospital Rehabilitation Services Department under the care of Susan Arceneaux, M.D. (Tr. 498-502). Prior to the commencement of this treatment, radiological imaging dated July 22, 2009 showed a normal lumbosacral and thoracic spine, vertebral body alignments within normal limits, maintained disc spaces, with no evidence of fracture or pathological bone lesions, degenerative change, pars defect, or paraspinous soft tissue mass. (Tr. 293). At her initial evaluation, Plaintiff was diagnosed with back pain and rheumatoid arthritis, and she reported pain all over her body that got worse with most activities, but better when sitting. (Tr. 500). Plaintiff's status on August 28, 2009 (and adopted by her discharge summary on October 2, 2009), stated Plaintiff reported both really good and really bad days, pain was down to 6 out of 10 (from 8 out of 10), but still had poor core strength. (Tr. 498-99). Therapy notes showed straight leg raises at 50 degrees, hip strength at 4-/5 hip flexors, and 4/5 extensors on the right and 4+/5 on the left. (*Id.*). The record reflected that Plaintiff missed several appointments due to family issues, and had to cease attending as of October 2, 2009 because she was starting a new job. (Tr. 498).

4. Nicholas Davis, M.D.

Records indicated Plaintiff's primary care physician is Nicholas Davis, M.D., from whom she receives medication management for anxiety, fibromyalgia, and rheumatoid arthritis. (Tr. 296-300, 306-08, 373-90). On July 19, 2010, visit notes showed well-controlled anxiety, and that Plaintiff was not having any pain (0 out of 10), and had no difficulties performing or completing routine daily living activities. (Tr. 297, 300). On November 18, 2011, Dr. Davis assessed fibromyalgia syndrome and chronic insomnia, and noted Plaintiff's denial of weight loss or fever, as well as other joint pain or swelling, stiffness, or muscle pain, reported pain at 0

9

out of 10, and no difficulties performing or completing routine daily living activities.  (Tr. 307, 310-11).  Similar findings were recorded on May 14, 2012, where Dr. Davis noted Plaintiff's history of pain and anxiety, but indicated Plaintiff appeared stable and was managing okay, despite her dealing with a difficult social situation.  (Tr. 386-89).

On May 4, 2013, Plaintiff again presented to Dr. Davis for anxiety and medication follow-up.  (Tr. 374-76).  Plaintiff informed Dr. Davis that she was not covered by insurance and was only able to obtain half her prescriptions for the month, supplementing with old medication to get by.  (Tr. 375).  She reported she could not think straight or accomplish much, and that, although she maintained interest in activities, she was not able to engage.  (*Id.*).  Plaintiff reported pain level at 8 out of 10 in muscles throughout her entire body, and difficulty performing or completing routine daily living activities.  (Tr. 378).

### 5.  Donald Riepenhoff, II, D.C.

Following a car accident, Plaintiff presented for treatment at Lorain County Chiropractic under the care of Donald Riepenhoff, II, D.C., on April 16, 2012.  (Tr. 364-66).  Plaintiff's chief complaint was neck pain, made worse by all activities longer than 15 minutes, as well as sleeping.  (Tr. 365).  Plaintiff further reported pain in her upper and lower back, as well as her hips, and stated all indicated pain was worse in the morning and got better as the day progressed. (*Id.*).    Radiologic examination showed normal lumbar, thoracic, and cervical spine with well-preserved disc spaces and mild levoscoliosis.  (Tr. 367-69).  Plaintiff underwent a 12 week treatment plan that included chiropractic manipulative treatment and therapeutic exercises, and was released from care on July 27, 2012.  (Tr. 321-66).

### C.  State Agency Consultants

In January of 2012, state agency physician Diane Manos, M.D., reviewed Plaintiffs medical records and assessed her physical limitations. (Tr. 96, 98-100). After considering the evidence of record, Dr. Manos limited Plaintiff to occasionally lifting or carrying twenty pounds, but frequently ten pounds, walking and sitting six hours with normal breaks, and no limitations in pushing and pulling (except for the lift/carry specifications). (Tr. 99). Additionally, Dr. Manos opined Plaintiff could occasionally climb ramps, stairs, ladders, ropes, and scaffolds, kneel, crouch, and crawl, had an unlimited ability to balance and stoop, as well as no manipulative limitations. (Tr. 99-100). In formulating her opinion, Dr. Manos indicated she considered Plaintiff's pain as well as her diagnoses of fibromyalgia with 18/18 tenderpoints and rheumatoid arthritis on high risk immunosuppression. (Tr. 99).

A second state agency physician, Steve McKee, M.D. reviewed Plaintiff's medical records and assessed her physical limitations in September of 2012. (Tr. 120, 122-26). Dr. McKee's opinion consisted of the same limitations as the previous opinion of Dr. Manos, with the exception of further limiting her to only occasionally handling (gross manipulation) and fingering (fine manipulation). (Tr. 98-100, 123-24). Dr. McKee indicated he considered Plaintiff's pain as well as her diagnoses of fibromyalgia with 18/18 tender points and rheumatoid arthritis on high risk immunosuppression, and noted Plaintiff experienced all over pain in her joints but exhibited range of motion within normal limits. (Tr. 123).

Joan Williams, Ph.D, a state agency psychological consultant, conducted a clinical consultation and evaluated Plaintiff in January of 2012. In addition to a psychological assessment, Dr. Williams' report included references to Plaintiff's physical ailments and limitations. The report stated Plaintiff drove herself to the evaluation and drives her husband to and from work, although driving makes her nervous and can be painful if she sits too long. (Tr.

313, 315, 317-18).    Plaintiff told Dr. Williams that she originally applied for disability due to her fibromyalgia and rheumatoid arthritis with psoriasis, and that imaging had revealed problems with arthritis in her back. (Tr. 313, 315).  Plaintiff reported her medical history to Dr. Williams, complaining of mainly arm and back pain and numbness, as well pain and swelling in her knees, ankles, and fingers, for which she reported taking a multitude of medications.   (Tr. 315). Plaintiff further reported to Dr. Williams that, while she can do laundry, sweep, and mop (but not all on the same day), due to her physical problems, she was no longer as active, that bending over was painful, she can only sit and stand for fifteen to twenty minutes, and had moved to a house with no stairs because it was too painful for her knees.   (Tr. 315, 317-18).   Further, Plaintiff told Dr. Williams she gets her children dressed and ready for the day, does the dishes, cares for family pets (including cats, a dog, and a guinea pig), cooks meals, and shops for groceries on her own.   (Tr. 317-18).   Dr. Williams' Functional Assessment report provided opinions relating only to Plaintiff's psychological limitations.  (Tr. 319).

### III. SUMMARY OF THE ALJ'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2.  The claimant has not engaged in substantial gainful activity since June 1, 2009, the alleged onset date.

3.  The claimant has the following severe impairments:  rheumatoid arthritis, fibromyalgia, depression, and anxiety.

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a reduced range of light work with the following nonexertional limitations.  She can lift up to twenty pounds occasionally and up to ten pounds frequently.  She can stand and walk for six hours and sit for six hours in

an eight-hour workday, with normal breaks.  She can frequently climb ramps and stairs but she can never climb ladders, ropes, or scaffolds.  She can frequently balance, stoop, kneel, crouch, and occasionally crawl.  She must avoid all exposure to hazardous machinery and unprotected heights.  She is limited to frequent handling, fingering and feeling with bilateral hands.  She is limited to superficial interaction with co-workers and the public, such as interaction that is of a brief duration and for a specific purpose.  The claimant requires a sit/stand option for 1-2 minutes duration every half hour without being off task.  In addition, the claimant will be off task 5% of the time.

6.  The claimant is unable to perform any past relevant work.

7.  The claimant was born on August 18, 1982 and was 26 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  The claimant subsequently changed age category to closely approaching advanced age.[3]

8.  The claimant has at least a high school education and is able to communicate in English.

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.  The claimant has not been under a disability, as defined in the Social Security Act, from June 1, 2009, through the date of this decision.

(Tr. 15-27).

## IV. DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance and/or Supplemental Security Income benefits only when she establishes disability within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423, 1381.  A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months."  *See* 20 C.F.R. §§ 404.1505, 416.905.

---

[3] The finding that Plaintiff changed age category to closely approaching advanced age appears to be a typographical error, as Plaintiff was 31 years old at the date of the ALJ's decision.  (Tr. 25).

## V.  STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards. *See Cunningham v. Apfel*, 12 F. App'x 361, 362 (6th Cir. 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence.  *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981).  Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.*

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion.  *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility.  *See Garner*, 745 F.2d at 387.  However, it may examine all the evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## VI.  ANALYSIS

### A.  The ALJ Properly Considered the Opinion Evidence Under the Treating Source Rule

It is well-established that an ALJ must give special attention to the findings of the claimant's treating sources. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

This doctrine, often referred to as the "treating source rule," is a reflection of the Social Security Administration's awareness that physicians who have a long-standing treating relationship with an individual are best equipped to provide a complete picture of the individual's health and treatment history. *Id.*; 20 C.F.R. §§ 416.927(c)(2), 404.1527(c)(2).

The treating source rule indicates that opinions from such physicians are entitled to controlling weight if the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with the other substantial evidence in the case record." *Wilson*, 378 F.3d at 544. When a treating source's opinion is not entitled to controlling weight, the ALJ must determine how much weight to assign to the opinion by applying factors set forth in the governing regulations. 20 C.F.R. §§ 416.927(c)(1)-(6), 404.1527(c)(1)-(6). These factors include the examining relationship, the treatment relationship, the length of treatment and frequency of examination, supportability and consistency of the opinion, the source's specialization, and any other factors tending to support or contradict the opinion. *Id.* The regulations also require the ALJ to provide "good reasons" for the weight ultimately assigned to the treating source's opinions that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinions and the reasons for that weight. *See Wilson*, 378 F.3d at 544 (*quoting* S.S.R. 96-2p, 1996 WL 374188, at *5).

Plaintiff argues the ALJ erred in failing to assign controlling weight to Plaintiff's treating rheumatologist, Dr. Kuchynski. In his analysis of the opinion evidence of record, the ALJ assigned "less weight" to Dr. Kuchynski's statements as to Plaintiff's RFC, although recognizing her as a treating source. (Tr. 24). Further, the ALJ assigned "significant weight" to the opinions of the State Agency medical consultants. (*Id.*).

Plaintiff points to the 6th Circuit opinion in *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234 (6th Cir. 2006), in support of her assignment of error.  In *Rogers*, the court determined the ALJ did not appropriately apply the treating source rule where he impliedly dismissed a claimant's fibromyalgia, despite a record replete with evidence from multiple treating doctors, both of whom suggested similar limitations respecting the claimant's functional abilities.  *Rogers*, 486 F.3d at 244.  Further, in rejecting the consistent and well-supported treating source opinions, the ALJ further failed to provide an analysis of factors considered in determining the weight given to these opinions.  *Id.*

Distinguishable from *Rogers*, the ALJ here conducted an analysis of the requisite factors and provided good reasons as to his assignments of weight to medical opinion evidence. Recognizing Dr. Kuchynski as a treating source and considering the records over the extended course of Plaintiff's treatment relationship with her, the ALJ found the extreme limitations in Dr. Kuchynski's opinion were not consistent with her own treatment notes, nor with the medical record as a whole.  (Tr. 24).  The ALJ's decision makes multiple references to medical evidence supporting his determination that Plaintiff's medication regimen generally kept her pain symptoms well-controlled.    (Tr. 22-24).    Additionally, to further undermine the severe limitations in Dr. Kuchynski's opinion, the ALJ recognized that periodic symptom flare-ups were successfully managed with no more than conservative and short-term treatment measures—mainly medication adjustments and Prednisone bursts.  (*Id.*).

There is no support for Plaintiff's argument that the ALJ improperly considered the objective medical evidence in weighing the medical opinions because Plaintiff has fibromyalgia. The undersigned acknowledges that fibromyalgia by nature does not generally manifest in objective, physical forms, and that reliance solely on objective medical findings for limitations

caused by this condition alone is improper. *Turner v. Colvin*, N.D. Ohio No. 1:13CV1916, 2014 WL 4930677, at *11 (Aug. 7, 2014) (noting that physical examination of fibromyalgia patients "will usually yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions" and that "CT scans, x-rays, and minor abnormalities 'are not highly relevant in diagnosing fibromyalgia or its severity.'") (*quoting Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988)).  However, Plaintiff's diagnoses also included rheumatoid arthritis in addition to fibromyalgia, and the ALJ correctly considered all the evidence in evaluating the consistency and supportability of the medical opinions.  Further, the ALJ did not base his decision solely on the objective evidence, but also supported his assignments of weight with other evidence, namely Plaintiff's ameliorative response to medication, gradual improvement as indicated by treatment notes, and reported daily activities. (Tr. 24).

In further support of his decision, the ALJ also found Dr. Kuchynski's RFC opinions inconsistent with Plaintiff's actual performance of daily activities.  Plaintiff again turns to *Rogers* and asserts that the ALJ's reasoning is insufficient because he mischaracterized Plaintiff's testimony regarding the scope of her daily activities, and failed to consider the physical impact on Plaintiff after performing these activities.  Plaintiff's argument here fails on several points. First, the evidence supports the ALJ's determination that Plaintiff performed daily activities including caring for her children, cooking meals (including one full meal daily prior to moving in with her mother, and a full-course breakfast once a week), driving, household chores, and shopping.  (Tr. 23-24).  Plaintiff does not point to any specific activity that is mischaracterized, but points generally to Plaintiff's testimony, which was appropriately discredited by the ALJ (as discussed later in this opinion). Next, although he does not expound as to the specific effects of

her daily activities, the ALJ considered and explicitly acknowledged that Plaintiff performed daily activities despite exacerbation of her pain symptoms, and that she received help from her family at times.  (*Id.*).

Further, while discrediting Plaintiff's treating physician, the ALJ properly gave good reasons in support of assigning significant weight to the state agency consultants' opinions in making his RFC determination.  An "ALJ's decision to accord greater weight to state agency physicians over [claimant's] treating sources was not, by itself, reversible error.*"  Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009).  Here, the ALJ clearly explained that he found the state agency opinions supported by objective evidence on the record, as well as by Plaintiff's "ameliorative response to medication" and her activities of daily living.  Specifically, in giving less weight to the opinion of Dr. Kuchynski, the ALJ reasoned the state agency medical consultants' assessments were more consistent with the medical record as a whole than was the opinion of Dr. Kuchynski.  (Tr. 24).  Finding these medical opinions supported by substantial evidence, it was within his discretion to give greater weight to the opinions of the state agency consultants over the discredited treating source opinion.

**B.  The ALJ Properly Assessed Plaintiff's Credibility**

Plaintiff also alleges that the ALJ failed to properly evaluate her credibility.  Generally, "[a]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the] ALJ is charged with the duty of observing a witness's demeanor and credibility."  *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008) (*citing Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)).  Notwithstanding, the ALJ's credibility finding must be supported by substantial evidence, *Walters*, 127 F.3d at 531, as the ALJ is "not free to make credibility determinations based solely upon an 'intangible or

intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting S.S.R. 96-7p, 1996 WL 374186, at *4).

The Sixth Circuit follows a two-step process in the evaluation of a claimant's subjective complaints of disabling pain. 20 C.F.R. §§ 404.1529, 416.929; *Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994).  First, the ALJ must determine whether the claimant has an underlying medically determinable impairment which could reasonably be expected to produce the claimant's symptoms. *Rogers*, 486 F.3d at 247.  Second, if such an impairment exists, then the ALJ must evaluate the intensity, persistence and limiting effects of the symptoms on the claimant's ability to work. *Id.*  The ALJ should consider the following factors in evaluating the claimant's symptoms:  the claimant's daily activities; the location, duration, frequency and intensity of the claimant's symptoms; any precipitating or aggravating factors; the type, dosage, effectiveness and side effects of any medication taken to alleviate the symptoms; treatment, other than medication, the claimant receives to relieve the pain; measures used by the claimant to relieve the symptoms; and statements from the claimant and the claimant's treating and examining physicians. *Id.*; *see Felisky*, 35 F.3d at 1039-40; S.S.R. 96-7p, 1996 WL 374186.

Taking into account Plaintiff's testimony, the record evidence, and applicable factors for evaluating credibility, the ALJ concluded that Plaintiff's medically determinable impairments could cause her alleged symptoms, but that her statements as to the intensity and limiting effects of her symptoms were not entirely credible. (Tr. 21-22)  Although case law recognizes painful symptoms of fibromyalgia often exist without extreme and obvious physical abnormalities or evidence, an ALJ may still appropriately consider a lack of abnormal and physical symptoms in his consideration of all the record evidence to determine a claimant's credibility.  *Hawk v. Astrue*, N.D. Ohio No. 4:11CV196, 2012 WL 3044291, at *7 (July 25, 2012) ("[A] diagnosis of

fibromyalgia does not automatically entitle a claimant to disability benefits…in cases involving fibromyalgia an ALJ must assess Plaintiff's credibility" to determine the severity of her pain). Here, after giving a detailed assessment of the medical evidence in his step three analysis, the ALJ appropriately considered the objective medical evidence and clinical findings along with other evidence of record.

Despite Plaintiff's argument to the contrary, the ALJ did not improperly consider Plaintiff's activities of daily living in discrediting her subjective allegations of pain and limited functioning.  Plaintiff relies on *Hawk*, which rejected the ALJ's reasoning that performance of "minimal daily living activities"—specifically cleaning her trailer, shopping, and taking care of her cats—supported a finding that the claimant with fibromyalgia could perform light work. *Hawk*, 2012 WL 3044291 at *9.  However, Plaintiff's application of *Hawk* is overreaching, as the case does not establish that daily living activities are never properly considered when determining a claimant's credibility.  *See Calvin v. Comm'r of Soc. Sec*., 437 Fed. Appx. 370, 371 (6th Cir. 2011) (affirming ALJ's finding that claimant's daily activities of providing sole care for himself and his 10-year-old daughter, driving, preparing meals, attending mass and outings to restaurants, movies, and baseball games, was inconsistent with his claims of being unable to perform light work).  Similar to *Calvin*, here the ALJ determined Plaintiff's alleged limitations, caused by fibromyalgia *and* rheumatoid arthritis, were not supported by other evidence on the record, including evidence that she performed significant activities of daily living, including taking care of herself as well as being the primary caregiver for her two children, providing transportation for herself and her husband, taking care of pets, preparing meals (including a full course breakfast once a week), performing household chores, and grocery shopping.

Beyond her daily activities, the ALJ also properly considered the other factors outline in *Rogers*, and his credibility determination is supported by substantial evidence.  First, in addition to the normal and negative test results, he also pointed to Plaintiff's compliance with a conservative[4] medication regimen that he found the medical record as a whole established as "relatively effective in controlling the claimant's symptoms, even during periods when she cannot afford regular compliance."  (Tr. 22).  Indeed, as noted by the ALJ, treatment records of both Plaintiff's primary care physician and treating rheumatologist showed Plaintiff's general toleration of her medication and reported their effectiveness in managing her symptoms  (Tr. 22-23).  This is further buttressed by Plaintiff's continual reporting to Dr. Kuchynski that the medications were generally working to keep her symptoms under control.  (*Id.*).  Further, the ALJ recognized Plaintiff's occasional financial hardship that kept her from obtaining all her medications at times, but found the evidence as a whole suggested she was able to generally maintain compliance.  Accordingly, the ALJ provided sufficiently good reasons, in addition to reliance on a lack of abnormal physical medical findings, to support the adverse credibility determination.

### C.  Failure to Analyze under Listing 14.09

At the third step of the disability evaluation process, the ALJ must evaluate whether the claimant's impairments satisfy the requirements of any of the medical conditions enumerated in the Listing of Impairments within 20 C.F.R. Part 404, Subpart P, Appendix 1. See 20 C.F.R §§ 416.920(a)(4)(iii), 404.1520(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010).  The Listing of Impairments recites a number of ailments which the Social

---

[4] Plaintiff argues the ALJ mischaracterizes her treatment as "conservative" due to the amount of medications she takes to control her symptoms.  However, Plaintiff does not provide any authority in support of her contention that taking a multitude of medications cannot be considered "conservative," nor does she point to treatment methods ignored by the ALJ that, taken together with her medication, would require a different designation.  (Plaintiff's Brief, pp. 20-21).

Security Administration has deemed "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 416.925(a), 404.1520(a).  Each listing describes "the objective medical and other findings needed to satisfy the criteria of that listing."  20 C.F.R. §§ 416.925(c)(3), 404.1520(c)(3).

In order to "meet" a listing, the claimant must satisfy all of the listing's requirements. *Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 653 (6th Cir. 2009).  However, if the claimant does not meet all of the listing's requirements, he may still be deemed disabled at this stage if his impairments "medically equal" the listing.  20 C.F.R. §§ 416.926(b)(3), 404.1526(b).  To do so, the claimant must present "medical findings" that show his impairment is "equal in severity to all the criteria for the one most similar listed impairment."  *Sullivan v. Zebley,* 493 U.S. 521, 531, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990) (emphasis in original).  It is not sufficient for a plaintiff to demonstrate that the overall functional impact of his impairments is as severe as that of a listed impairment. *Id.*

Here, the ALJ concluded at step two that Plaintiff's rheumatoid arthritis, fibromyalgia, depression, and anxiety were severe impairments.  (Tr. 15).  At step three, he found that despite Plaintiff's severe impairments, none reaches the level of severity required by the Listing of Impairments either separately or in combination.  (Tr. 15-16). At this step of analysis, the ALJ specifically referred to Listings 1.02 (major dysfunction of a joint(s) (due to any cause)), 1.04 (disorders of the spine), 12.04 (affective disorder), and 12.06 (anxiety-related disorder).

The ALJ found Plaintiff did not meet or equal any of the Listed Impairments, and specifically, his rheumatoid arthritis and fibromyalgia did not fulfill the requirements of Listing 1.02 (major dysfunction of a joint(s) (due to any cause) or Listing 1.04 (disorders

of the spine).  In his analysis under these listings, the ALJ explained the specific requirements of the listings, which required showing both physical deformity or physical manifestation of impairment to the relevant body part, as well as pain and limited or impaired functioning.  (Tr. 16-17).  The ALJ considered objective medical evidence including radiological and electrodiagnostic testing, as well as pain symptoms and medical treatment notes.  (Tr. 17-18).  Objective tests revealed generally normal or negative results, with non-traumatic mild levoscoliosis in Plaintiff's thoracic spine following a car accident in April of 2012.  (*Id.*).  In addition to this evidence, the ALJ also remarked that treatment notes from Plaintiff's treating physicians showed her symptoms of pain, swelling, and stiffness were generally well-controlled with medication (acknowledging the occasional inability of Plaintiff to purchase all her medications), and that Plaintiff's complaints of pain, despite occasional and short-term exacerbations, decreased over time.  (*Id.*).  Further, the ALJ pointed to records of Plaintiff's chiropractic treatment following her car accident, that showed her discharge from treatment on July 27, 2012 after improvement of her joint pain symptoms.  (Tr. 17).

Plaintiff contends the ALJ erred by not considering section D of Listing 14.09 and that her rheumatoid arthritis and fibromyalgia symptoms satisfied the necessary requirements to find her disabled.  Section D of Listing 14.09 requires a claimant to show:

> Repeated manifestations of inflammatory arthritis, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:
>
> 1.   Limitations of activities of daily living.
>
> 2.   Limitation in maintaining social functioning.

23

    3.   Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

20 C.F.R. Part 404, Subpart P., Appx. 1, Listing 14.09D.  The Listings explain "Listing-level severity is shown in …14.09D by inflammatory arthritis that involves various combinations of complications of one or more major peripheral joints or other joints, such as inflammation or deformity, extra-articular features, repeated manifestations, and constitutional symptoms or signs."  20 C.F.R. Part 404, Subpart P, Appx 1, § 14.00(D)(6)(e)(ii).  Listing 14.09D may be proven, in part, by inflammation *or* deformity.

    The Court agrees that the ALJ should have additionally (or alternatively) analyzed Plaintiff's rheumatoid arthritis and fibromyalgia under Listing 14.09.   First, the Listings specifically direct that, "[t]he provisions of 1.02 and 1.03 notwithstanding, inflammatory arthritis is evaluated under 14.09."  20 C.F.R. Part 404, Subpart P, Appx. 1, 1.00(B)(1); *see Dunbar v. Comm'r of Soc. Sec.*, Dist. Md. No. JFM-13-2091, 2014 WL 4388368, at *3 (Sept. 4, 2014) (ALJ erred in giving significant weight to opinion of medical expert that only considered claimant's rheumatoid arthritis under Listing 1.02 and not 14.09 because such analysis "called into question his facility with disability determination requirements.") (citing 20 C.F.R. Subpt. P., App. 1 § 1.00(B)(1) ("The provisions of 1.02 and 1.03 notwithstanding, inflammatory arthritis is evaluated under 14.09.")).  Second, although 14.09 states impairments may be evaluated under any appropriate listing where both inflammation and chronic deformities are present, the objective evidence in the record does not show Plaintiff exhibited chronic deformities.  20 C.F.R. Part 404, Subpart P, Appx. 1, 14.09(e)(iv).  Finally, although previous cases show analysis of rheumatoid arthritis and fibromyalgia under Listings 1.02 and 1.04, more recent cases support Plaintiff's contention that limitations stemming from rheumatoid arthritis and fibromyalgia are

more properly reviewed under Section 14.09.[5]  *See Fleming v. Astrue*, N.D. Ohio No. 1:09CV373, 2010 WL 649742, at *3 (Feb. 19, 2010) (acknowledging plaintiff's agreement with government that "rheumatoid arthritis has been moved from Listing 1.02 and is evaluated under Listing 14.09."); *see Hakkarainen ex rel. Blanton v. Astrue*, N.D. Ohio No. 1:10CV2463, 2012 WL 398595, at *10-13 (Jan. 19, 2012) (agreeing that ALJ erroneously failed to consider whether claimant's severe physical impairment, rheumatoid arthritis, met or medically equaled an impairment in the Listings—particularly Listing 14.09); *see Thornton v. Astrue*, E.D. Mich. No. 11-15527, 2013 WL 588995, at *2 (Feb. 14, 2013) (remanding case where ALJ did not discuss Listing 14.09D in relation to claimant's rheumatoid arthritis, finding "The requirements of Listing 1.02 and Listing 14.09D are different.  Listing 14.09D can be satisfied by showing inflammation in one wrist/hand" along with the other requirements, while Listing 1.02 required both wrists/hands to be affected.).  Accordingly, although consideration of Listings 1.02 and 1.04 may have been appropriate in addition to analysis under 14.09, the ALJ erred in failing to analyze the evidence under 14.09.

However, the ALJ's failure at step three to analyze Plaintiff's limitations under 14.09 is harmless error and does not require remand.  "An agency's violation of its procedural rules will not result in reversible error absent a showing that the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses."  *Wilson*, 378 F. 3d at 546-47 (*quoting Connor v. U.S. Civil Serv. Comm'n*, 721 F.2d 1054, 1056 (6th Cir. 1983)).  It is well recognized that where remand would be an "idle and useless formality," courts are not

---

[5] Previous cases where analysis of rheumatoid arthritis under Listing 1.02 quote different language from that Listing than its current form, suggesting, in accordance with the current language provided in the Listings, along with more recent case law, review of that condition may be more properly considered now under Listing 14.09.  *See, cf. Adams v. Comm'r of Soc. Sec.*, 55 Fed. Appx. 279, 284 (6th Cir. 2003) (identifying Listing 1.02 as titled "Active rheumatoid arthritis or other inflammatory arthritis") *with* 20 C.F.R. part 404, Subpart P, Appx. 1, Listing 1.02 "Major dysfunction of a joint(s) (due to any cause) and Listing 14.09 "Inflammatory arthritis."

required to demand further review of agency action. *Rabbers*, 582 F.3d at 654 (*citing NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n. 6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969)).

Plaintiff fails to meet her burden to show her impairments of rheumatoid arthritis and fibromyalgia meet or equal Listing 14.09. "[A] claimant has the burden of demonstrating that her impairment meets or equals a listed impairment." *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001). At step three, although the ALJ should have reviewed the evidence under Listing 14.09, he did a thorough analysis of the evidence under related listings, and his decision reflected his opinion regarding Plaintiff's rheumatoid arthritis and fibromyalgia beyond merely the objective medical evidence of physical deformities, such as subjective complaints of pain and functional limitations. (Tr. 17-18). In her brief, Plaintiff does not point to any evidence that was not considered by the ALJ in his decision, much of which was appropriately discredited, as discussed above. Plaintiff merely re-argues her case based on evidence properly assessed by the ALJ, and does not provide any convincing argument to show how the evidence of record would meet or equal the requirements of Listing 14.09. As such, remand on this issue is not appropriate.

### D. The Hypothetical Presented to the VE at the Hearing Adequately Reflected Plaintiff's RFC Limitations

At the fifth and final step the sequential analysis, the ALJ must determine whether, in light of the claimant's residual functional capacity, age, education, and past work experience, the claimant can make an adjustment to other work. 20 C.F.R. § 416.920(a)(4). The Commissioner carries the burden to prove the existence of a significant number of jobs in the national economy that a person with the claimant's limitations could perform. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). To meet this burden, there must be a finding supported by substantial evidence that the claimant has the vocational qualifications to perform specific jobs. *Workman v.*

*Comm'r of Soc. Sec.*, 105 F. App'x 794, 799 (6th Cir. 2004) (*quoting Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)). Substantial evidence may be produced through reliance on the testimony of a VE in response to a hypothetical question if the question accurately portrays the claimant's impairments. *Workman*, 105 F. App'x at 799 (*quoting Varley*, 820 F.2d at 779).

A hypothetical question must incorporate all of the claimant's physical and mental limitations, but this principle "does not divest the ALJ of his or her obligation to assess credibility and determine the facts." *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007) (*quoting Redfield v. Comm'r of Soc. Sec.*, 366 F.Supp.2d 489, 497 (E.D. Mich. 2005)). In fashioning a hypothetical question to be posed to a vocational expert, the ALJ is required to incorporate only those limitations that he accepts as credible. *Casey v. Sec'y of HHS*, 987 F.2d 1230, 1235 (6th Cir. 1993).

There is no merit to Plaintiff's argument that the hypothetical presented to the VE was incomplete and thus inadequate. Here, the ALJ posed a hypothetical question to the VE setting forth Plaintiff's limitations as described in the RFC. (Tr. 21, 82, 84). Based on this question, the VE testified that Plaintiff could perform the requirements of a significant number of jobs in the national economy, which included the positions of mail clerk (DOT #209.687-026), packager (DOT #559.687-074), and assembler, aka bench assembler (DOT #706.684-022). (Tr. 22, 26, 49-50). Plaintiff does not argue that the hypothetical presented failed to include limitations from the RFC; rather, Plaintiff's entire argument stems from her assertion that the RFC on which the hypothetical was based was inadequate due to the ALJ's failure to include limitations expressed by Dr. Kuchynski and through Plaintiff's subjective complaints. As previously discussed, the ALJ properly discredited the opinions of Dr. Kuchynski and Plaintiff's subjective complaints,

and was thus not required to include these limitations in the RFC.  *Casey*, 987 F.2d at 1235. Accordingly, Plaintiff provides no adequate basis for her argument that remand is necessary for further evaluation by a VE upon reformulation of Plaintiff's RFC.

## VII. DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is supported by substantial evidence.  Accordingly, the undersigned recommends that the decision of the Commissioner be AFFIRMED

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date:  January 6, 2016.

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1).  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).